IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Brenda Doyle, on behalf of M.H., ) | C/A No. 1:10-1355-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | ORDER |
| Michael J. Astrue, Commissioner, ) | |
| Social Security Administration ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable R. Bryan Harwell's November 17, 2010 order referring this matter for disposition. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff Brenda Doyle brings this action on behalf of her minor son, M.H. References to "Plaintiff" herein refer to M.H. on whose behalf his mother Brenda Doyle files this appeal pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Insurance Benefits ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the Commissioner's decision is affirmed.

I.      Relevant Background

    A.      Procedural History

    In March 2007, Plaintiff filed an application for SSI, claiming disability from his birth in 1999. Tr. at 50 53, 58 59, 97 104. Plaintiff claimed to be disabled because his I.Q. scores and his additional severe impairments of a language disorder and trichorhinophalangeal syndrome[1] caused him to meet or medically equal Listing 112.05D of the "Listed Impairments," found at 20 C.F.R. § pt. 404, subpt. P, app. 1 [hereinafter cited as "the Listings"]. Tr. at 20, 33. Plaintiff's application was denied initially and on reconsideration. Tr. at 50 59. On January 30, 2009, the Administrative Law Judge ("ALJ") held a hearing at which Plaintiff and his mother testified. Tr. at 28 46 (Hr'g Tr.). In a September 16, 2009 decision, the ALJ found Plaintiff was not disabled. Tr. at 17 27. The Appeals Council denied Plaintiff's request for further review, making the ALJ's decision the Commissioner's final decision for purposes of appeal. Tr. at 1 5. On May 25, 2010, Plaintiff timely filed this action seeking judicial review of the Commissioner's decision.

---

[1]Trichorhinophalangeal syndrome or Langer-Giedion syndrome is an inherited disorder characterized by mental retardation, microcephaly, multiple exostosis, characteristic facies with bulbous nose, sparse hair, cone-shaped epiphyses, loose redundant skin, joint laxity, and other anomalies. Dorland's Illustrated Medical Dictionary 1823 (30th ed. text 2003) (as cited in Def.'s Br. at 4, n.3).

B.    Plaintiff's Relevant Medical History[2]

In February 2006, Melanie DeWitt, Ph.D. and Michelle Turner, Ph.D. evaluated Plaintiff at the request of the Greenville County School District. Tr. at 198 208. Their comprehensive psychological evaluation report indicated Plaintiff had a history of developmental delay and language processing difficulties. Tr. 198 99, 208. Their report indicated that, according to a prior 2004 evaluation, Plaintiff had received speech and language services for a moderate language disorder and had been enrolled in a preschool program for children with disabilities based on a prior evaluation. Tr. at 199. Based on the 2004 evaluation, Plaintiff was dismissed from special educational services. Tr. at 199. Plaintiff's teacher in February 2006 reported to Dr. DeWitt and Dr. Turner that Plaintiff had been performing below grade level and was struggling in all academic areas. Tr. at 199. The teacher also reported that Plaintiff was putting forth effort, but that he had difficulty understanding, which often resulted in his engaging in attention-seeking behavior. Tr. at 199.

Dr. DeWitt and Dr. Turner performed several diagnostic tests during the February 2006 evaluation. Tr. at 201 07. Tests they administered provided the following as to his intelligence quotient ("I.Q.") based on the Stanford Binet Intelligence Scale Fifth

---

[2]Plaintiff argues that his mental impairment meets the criteria of Listing 112.05D, Mental Retardation. Because Plaintiff does not challenge the ALJ's findings concerning his other impairments, the court does not include detailed discussion of his other conditions.

Edition (SB-V): nonverbal I.Q. of 73; verbal I.Q. of 80; and a full scale I.Q. of 75. Tr. at 202. Dr. DeWitt and Dr. Turner also administered achievement tests, which indicated Plaintiff's skills were in the following ranges: general nonverbal cognitive ability "average;" verbal cognitive ability "below average;" written expression "low average;" math calculation skills "deficient;" math reasoning skills "below average;" oral skills "deficient;" basic reading skills "low average" to "deficient;" and reading and listening comprehension "very deficient." Tr. at 207. They concluded that Plaintiff was a potential candidate for special education services under the learning disabilities classification. Tr. at 207.

In April 2006, R. Curtis Rogers, M.D., clinical geneticist, and Brooke Smith, M.S., genetic counselor, examined Plaintiff and noted that he had mild learning problems and had Type 1 trichorhinophelangeal syndrome. Tr. at 233 34.

In October 2006, Lauren H. Batson, Ph.D., licensed clinical psychologist and pediatric neuropsychologist, evaluated Plaintiff at the school district's request. Tr. at 237 46. She noted that Plaintiff had a history of developmental delay and ongoing language and academic difficulties, and that he was repeating first grade at the time of the evaluation. Tr. at 238 41. He attended a regular classroom, but he received one period of resource instruction daily and speech therapy weekly to work on his articulation difficulties. Tr. at 238.

Dr. Batson administered several diagnostic tests, which she found provided a reliable estimate of Plaintiff's functional level at the time of the testing.  Tr. at 239. Plaintiff's full scale I.Q. score was 70 on the Wechsler Intelligence Scale for Children Fourth Edition ("WISC-IV").  Tr. at 244.  He scored a 79 on his Verbal Comprehensive Index, a 73 on his Perceptual Reasoning Index, an 80 on the Working Memory Index, and a 70 on his Processing Speed Index.  Tr. at 44.  Dr. Batson indicated that Plaintiff's scores on the WISC-IV reflected that his intellectual abilities fell well below average and that such scores were also consistent with previous testing, including the Stanford-Binet IV, on which Plaintiff had tested at a full scale I.Q. of 75 in February 2006.  Tr. at 239. Dr. Batson noted that her assessment placed Plaintiff's intellectual functioning within the borderline range and just above the mildly mentally retarded range. Tr. at 241.  She indicated he should receive "as much individualized instruction" as possible.  Tr. at 241.

In April 2007, Kristina Stroud, speech therapist, completed a speech/language report and indicated that Plaintiff had a language disorder for which he had been receiving group speech therapy. Tr. at 285 86. Ms. Stroud stated that Plaintiff had difficulty answering questions from a story and describing items.  Tr. at 286.  She further reported that he could communicate his basic needs and carry on age-appropriate conversations with adults and peers, and that he was sometimes able to understand and follow simple directions.  Tr. at 285.

On April 23, 2007, occupational therapist Ginnette Malay-Romkey evaluated Plaintiff and found that he deficits for position in space, copying, figure ground, and visual closure that could potentially impact his reading, writing, and math skills.  Tr. at 288 93.  She recommended group occupational therapy and speech therapy for Plaintiff. Tr. at 292.

In June 2007, pediatric medical consultant Donna Stroud, M.D. reviewed Plaintiff's medical records on behalf of the state agency.  Tr. at 294 99.  Dr. Stroud concluded that Plaintiff had a probable genetic syndrome, speech and language disorder, and borderline intellectual functioning, but she opined that those impairments did not satisfy the diagnostic descriptions contained in the Listings.  Tr. at 294.

In July 2007, speech-language pathologists Jenny Kern, M.S., CFY-SLP and Beth Clark, M.S., CCC-SLP performed a speech-language evaluation.  Tr. at 300 04.  They diagnosed Plaintiff with expressive and receptive language disorder and recommended individualized speech therapy for him.  Tr. at 303.  They also recommended that Plaintiff be given additional time at school to complete verbal and written assignments.  Tr. at 303.

In August and September of 2007, Sehan El-lbiary, M.D., and Lisa Varner, Ph.D., reviewed the medical records on behalf of the state agency.  Tr. at 305 10. Both doctors concurred with Dr. Stroud's earlier findings that Plaintiff's impairments did not satisfy the diagnostic descriptions contained in the Listings.   Tr. at 305.

2.    School Records

During the 2006 07 school year, Plaintiff attended the first grade at Stone Elementary School. In April 2006, the school conducted an Individualized Education Program ("IEP") evaluation and determined that Plaintiff had a learning disability and a speech language disability. Tr. at 209 29. The evaluation showed that he spent between 80 and 100 percent of his time in a regular classroom, but that he received special education services in reading, math, listening comprehension, and communication. Tr. at 209, 218. The IEP indicated that Plaintiff's academic skills were below grade level in writing, reading, and math, and that he had significant difficulties with oral language skills, particularly comprehension. Tr. at 210 12. He remained eligible for special education services. Tr. at 227 28.

Plaintiff transferred to Cherrydale Elementary School, which conducted an updated IEP in April 2007 for the 2007 08 school year. Tr. at 172 88. The IEP indicated that Plaintiff spent between 80 and 100 percent of his time in a regular classroom and recommended that Plaintiff receive special education services related to communication, reading, and language. Tr. at 181. Regarding his academic skills, Plaintiff tested 15 levels below his peers in a general education classroom reading program and was one grade level below his peers in reading overall. Tr. at 173. He was performing at a first-grade level in math. Tr. at 173. He was also working below grade level in grammar. Tr. at 173.

On April 11, 2007, Ms. Claudia Peacock, Plaintiff's teacher at Cherrydale Elementary School, completed a Teacher Questionnaire. Tr. at 274 81. She indicated she had been teaching Plaintiff for six hours per day for eight months, that he was at grade level for math and the written language, and that he was functioning one level below grade level in reading. Tr. at 274. She noted he received one period per day of special education training in reading, language, and math. Tr. at 274.

Mrs. Peacock evaluated Plaintiff's functioning in the six domains defined in the Commissioner's regulations, 20 C.F.R. § 416.926a. Tr. at 275 79. She found Plaintiff had "no problems" in the following domains: attending and completing tasks; moving about and manipulating objects; and caring for himself. Tr. at 276 79. With respect to the domain of acquiring and using information, she indicated Plaintiff had some problems, noting he was "just below grade level in reading, math [was] on grade level [and] just below grade level in language." Tr. at 275. Regarding the domain of interacting and relating with others, Mrs. Peacock found that Plaintiff had "slight problems" with seeking attention appropriately and in following classroom rules. Tr. at 277. She noted that he was independent in all areas at school. Tr. at 277.

During the 2008 09 school year, Plaintiff was promoted to third grade, spent more 80 to 100 percent of his time in a regular classroom, but he received special education training in communication, reading, and language. Tr. at 153 71. His IEP indicated he

was performing below his peers, but that he showed improvement in reading and language skills and that he had adequate articulation skills. Tr. at 154  55.

C.    Administrative Proceedings

1.    The Administrative Hearing

At the January 2009 hearing, Plaintiff's mother, Brenda Doyle, testified on his behalf.  In response to questions from the ALJ, she testified that her son had repeated both the first and second grades and that, at the time of the hearing, he was ten years old and in the third grade. Tr. at 30.  She testified that he attended regular classes at school, but that he received some resource assistance. Tr. at 36.  Ms. Doyle testified Plaintiff's trichorhinophalangeal syndrome was a life-long condition and affected his speech and his ability to understand and comprehend. Tr. at 33  34.  She  indicated that he was able to pay attention, but that he was very slow in completing tasks. Tr. at 37  38.  She indicated he was very weak in his hands. Tr. at 39.  She also said he was able to dress himself, but that she had to help him bathe and stay clean and had to remind him to perform daily hygiene tasks. Tr. at 39  40.

Plaintiff also testified at the hearing. Tr. at 42  44.  He said that he liked school and that he enjoyed watching television, playing with toy cars, and playing football and basketball.  Tr. at 43  44.  He also testified that he tried to help his mother by cleaning his room.  Tr. at 43  44.  In response to questions from the ALJ, Plaintiff indicated that he did not have friends at school or friends who came to see him at home.  Tr. at 43.

2.     The ALJ's Decision

In issuing his September 16, 2009 decision, the ALJ followed the three-step sequential evaluation process for evaluating child disability claims. 20 C.F.R. § 416.924(a).  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 16, 2007, the date the application was filed. Tr. at 20.  At step two, he found that Plaintiff had the following severe impairments: trichorhinophelangeal syndrome; language disorder; and low intellectual functioning.  Tr. at 20.  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the requirements of any of the Listings.  Specifically, the ALJ found that Plaintiff did not meet Listing 112.05D, Mental Retardation.  *See* 20 C.F.R. part 404, subpt. P, app. 1.  Tr. at 20.  Further, he found that Plaintiff's impairments did not functionally equal the Listings because they did not result in an extreme limitation in one domain or in marked limitations in two domains of functioning.  Tr. at 20 26.  Thus, the ALJ concluded that Plaintiff was not disabled.  Tr. at 26 27.

II.     Discussion

Plaintiff's principal argument is that the ALJ erred by discounting Plaintiff's I.Q. score of 70 and finding Plaintiff did not satisfy the requirements of Listing 112.05D. Pl.'s Br. at 8 12.  He also argues that the ALJ's decision is not supported by substantial evidence.   Pl.'s Br. at 12 13. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

10

A.    The ALJ's Findings

In his September 16, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant was born on January 18, 1999 and was therefore in the primary school children age group (age 6-12) on March 16, 2007, the date the application was filed (e.g., 20 CFR 416.926a(g)(2)(v)).

2.    The claimant has not engaged in substantial gainful activity since the date the application was filed (20 CFR 416.924(b) and 416.972).

3.    The claimant has the following severe impairments: trichorhinophelangeal syndrome; language disorder; and low intellectual functioning (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Part A or B (20 CFR 416.920(d), 416.924, 416.925 and 416.926).

5.    The claimant does not have an impairment or combination of impairments that functionally equaled the listings (20 CFR 416.924(d) and 416.926a).

6.    Because the claimant does not have an impairment or combination of impairments that meets, medically equals any listing or functionally equals the listings, the claimant is not disabled (20 CFR 416.924(a)).

7.    The claimant has not been under a disability, as defined in the Social Security Act, since his filing date of March 16, 2007 through the date of this decision (20 CFR 416.924(a) and 416.920(t)).

Tr. at 20, 21, 26.

11

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

For purposes of eligibility for children's disability benefits under the Act, an individual under age 18 will be considered disabled if he has a "medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for not less than 12 months." 20 C.F.R. § 416.906; *see also* 42 U.S.C. § 1382c(a)(3)(C)(i).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of sequential questions.    *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations in adult disability matter and noting "need for efficiency" in considering disability claims). The Commissioner's regulations establish a three-part evaluation process:  (1) determine whether the child is currently engaged in substantial gainful activity ("SGA"); (2) determine whether the child has a severe impairment or impairments; (3) determine whether the child's impairments meet, medically equal, or functionally equal any impairment found in the Listings.  *See* 20 C.F.R. § 416.924, 20 C.F.R. pt. 404, subpt. P, app. 1.

In determining whether a claimant has engaged in SGA, the Commissioner uses the same rules for children under age 18 as he does for adults. 20 C.F.R. § 416.924(b).

SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. § 416.972(b). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 C.F.R. § 416.974; 20 C.F.R. § 416.975. If an individual engages in SGA., he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable "severe" impairment or a combination of impairments that is "severe." For an individual who has not attained age 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. If the claimant does not have a medically determinable severe impairment(s), he is not disabled. 20 C.F.R. § 416.924(c). If the claimant has a severe impairment, the analysis proceeds to the third step.

At step three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a

Listed impairment, or that functionally equals one of the impairments found in the Listings. In making that determination, the Commissioner must consider the combined effect of all medically determinable impairments, even those that are not severe. 20 C.F.R. § 416.923; 20 C.F.R. § 416.924a(b)(4), and 20 C.F.R. § 416.926a(a), (c). If the claimant has an impairment or combination of impairments that meets, medically equals or functionally equals the Listings, and it has lasted or is expected to last for a continuous period of at least 12 months, he is presumed to be disabled. If not, the claimant is not disabled. 20 C.F.R. § 416.924(d). If he does not satisfy any of these three steps, he is not disabled. *See* 20 C.F.R. § 416.924(b) (d).

In determining whether a claimant meets one of the impairments in the Listings, the Commissioner compares the symptoms, signs, and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for the Listed impairment. "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, . . . then [the claimant] 'is conclusively presumed to be disabled and entitled to benefits.'" *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (*quoting Bowen v. City of New York*, 476 U.S. 467, 470 71 (1986)). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). It is not enough that the impairment have the diagnosis of a Listed impairment, the claimant must also have the findings shown in the Listing of that impairment. 20 C.F.R.

14

§ 416.925(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987) (noting the claimant's burden to show that his impairment is presumptively disabling and to furnish medical evidence regarding his condition).

If the claimant's impairment or combination of impairments does not meet or medically equal the requirements of a Listing, the Commissioner will decide whether it results in limitations that functionally equal such requirements. *See* 20 C.F.R. § 416.926a(a). To assess functional equivalence, the Commissioner considers how the claimant functions in activities in terms of six domains, which are broad areas of functioning intended to capture what a child can or cannot do. 20 C.F.R. § 416.926a(b)(1). These domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well being. 20 C.F.R. § 416.926a(b)(1)(i) through (vi). To establish functional equivalence, the claimant must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(b)(1). The Commissioner will find that a claimant has a "marked" limitation in a domain when his impairment or combination of impairments interferes seriously with his ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation also means a limitation is "more than moderate" but "less than extreme," and may arise when several

activities or functions are limited, or when only one is limited. *Id.* The Commissioner will find that the claimant has an "extreme" limitation in a domain when his impairment or combination of impairments interferes very seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation also means a limitation is "more than marked," and may arise when one or more activities or functions is limited. *See id.*

        2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157 58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at

390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157 58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

> C.     Analysis

>> 1.     The ALJ's Finding that Plaintiff Is Not Disabled Is Supported by Substantial Evidence.

Plaintiff's principal argument is that the ALJ erred by finding the October 2006 full scale I.Q. of 70 to be invalid and, in so finding, concluding that Plaintiff did not satisfy the requirements of Listing 112.05D. Pl.'s Br. at 10 12; Pl.'s Reply Br. at 2. Listing 112.05 concerns the impairment of "Mental Retardation" and sets forth the following requirements:

> 112.05 Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
> . . .
> D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;

> . . .

20 C.F.R. pt. 404, Subpart P, App. 1, § 112.05.  Plaintiff contends that the ALJ erroneously failed to find that his I.Q. met the scaled score requirement of subsection D.

> a.    The ALJ Did Not Err In Rejecting Plaintiff's I.Q. Score of 70.

In finding Plaintiff did not satisfy the I.Q. score-requirement of Listing 112.05D, the ALJ found that Plaintiff's full scale I.Q. score of 70 was invalid. Specifically, he found as follows:

> The undersigned rejects the argument of the claimant's attorney alleging that the claimant's condition meets the requirements of Listing 112.05(D). Treatment notes reveal that the claimant had the following IQ scores: February 2006 Verbal IQ of 80 and Full Scale IQ of 75; and October 2006 Full Scale IQ of 70. (Exhibits 1F and 3F). The undersigned finds that when considering the evidence as a whole, including the claimant's most recent teacher evaluation indicating grade-level functioning in math and written language, the claimant's IQ scores of 75 and 80 better reflect his ability to function and are given more weight. As a result, the undersigned finds that because the claimant's Full Scale IQ of 70 is invalid, the claimant's condition fails to meet the requirements of Listing 112.05(D).

Tr. at 20.

Plaintiff argues the ALJ did not consider the score in the context of the record as a whole, erroneously finding the score invalid based only on the evaluation by Plaintiff's teacher, Ms. Peacock.  Additionally, Plaintiff argues that the ALJ did not consider Dr. Batson's entire October 2006 report, particularly her finding that the testing results she reported   including the I.Q. score of 70   provided "a reliable estimate of [Plaintiff's] current levels of functioning."  Pl.'s Br. at 10 (*quoting* Tr. at 239).  Plaintiff also claims that the ALJ should have acknowledged Dr. Batson's report that the October 2006 I.Q.

18

scores were consistent with Plaintiff's previous I.Q. test scores.  Tr. at 239.  Further, Plaintiff claims that the ALJ erred by not discussing the testing results of tests administered by the Greenville County School District in February 2006.  Pl.'s Br. at 10 11.  Plaintiff claims those test results bolster the October 2006 I.Q. score and that the ALJ erred by not expressly considering them.

The Commissioner counters that the ALJ appropriately discounted the I.Q. score of 70 and that he did what he was supposed to do   consider the evidence and the record as a whole and make findings as to any conflicts in the evidence.[3]  The Commissioner points out that in February 2006, not long before Dr. Batson tested Plaintiff, Dr. DeWitt and Dr. Turner evaluated Plaintiff and tested his I.Q., as well.  Def.'s Br. at 12.  The February 2006 scores from the I.Q. tests administered by Dr. Dewitt and Dr. Turner were all above 70:  Verbal I.Q. of 80; Nonverbal I.Q. of 73; Full Scale I.Q. of 75.  The Commissioner argues that the ALJ appropriately considered the two sets of I.Q. test results and the accompanying reports.  He argues that the ALJ adequately evaluated the I.Q. test results of February and October 2006 by considering them in conjunction with other record evidence, including results of other tests taken by Plaintiff and the detailed evaluation of Ms. Peacock, his school teacher who spent a great deal of time with him.

_____

[3]The Commissioner also raises the alternative argument that the ALJ's focus on Plaintiff's I.Q. scores was unnecessary because Plaintiff did not meet the preliminary requirements of Listing 112.05.  *See* Def.'s Br. at 14 20.  The court addresses that argument below.

The Commissioner cites *Woodhouse ex rel. Taylor v. Astrue*, 696 F. Supp. 2d 521, 532 (D. Md. 2010) to support his argument.  In that case, the court affirmed the ALJ's decision that a claimant did not satisfy criteria of a Listed impairment.  In considering whether the claimant satisfied the requirements of Listing 112.05, the court noted that the ALJ was not to "blindly accept IQ tests," but was to consider and resolve any discrepancies between scores and daily activities.  *Woodhouse*, 696 F. Supp. 2d at 533.  In support, the *Woodhouse* court cited a portion of 20 C.F.R. § 404 Subpt. P App. 1 § 112.00, the introductory section to the mental disorders listings for children, which provides the following:

> D. 8. The salient characteristics of a good test are: (1) Validity, i.e., the test measures what it is supposed to measure; (2) reliability, i.e., the consistency of results obtained over time with the same test and the same individual; (3) appropriate normative data, i.e., individual test scores can be compared to test data from other individuals or groups of a similar nature, representative of that population; and (4) wide scope of measurement, i.e., the test should measure a broad range of facets/aspects of the domain being assessed. **In considering the validity of a test result, we should note and resolve any discrepancies between formal test results and the child's customary behavior and daily activities.**

20 C.F.R. § 404 Subpt. P App. 1 § 112.00(D)(8) (emphasis added).

Here, the ALJ followed the Commissioner's regulations by examining the full record and considered the I.Q. score of 70 in conjunction with other record evidence.  He compared the testing scores available, resolved conflicts in the evidence, and examined the scores in connection with other relevant information in the record. This evidence included an evaluation by Plaintiff's teacher who reported on his "customary behavior

and daily activities," as Section 112.00(D)(8) contemplates.  *See* Tr. at 20 (finding Plaintiff's I.Q. scores of 75 and 80 "better reflect his ability to function" based on consideration of the evidence "as a whole, including the claimant's most recent teacher evaluation").

Plaintiff focuses on the ALJ's failure to expressly discuss Dr. Batson's finding in her report that the I.Q. score of 70 was "felt to provide a reasonable estimate of [Plaintiff's] current levels of functioning."  Pl.s' Reply at 2 (*citing* Tr. at 239).  Plaintiff also claims that the ALJ ignored other evidence that support a finding that the I.Q. score of 70 was valid, including the February 2006 tests conducted by the Greenville County School District.  *See* Tr. at 203 05.

An ALJ is not required to include in his written decision a detailed evaluation of every piece of evidence.  Rather, he is required only to "'minimally articulate' his reasoning so as to 'make a bridge' between the evidence and his conclusions." *Jackson v. Astrue*, No. 8:08-2855-JFA, 2010 WL 500449, *10 (D.S.C. Feb. 5, 2010) (*quoting Fischer v. Barnhart*, 129 F. App'x 297, 303 (7th Cir. 2005); *see also Dryer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (stating that the ALJ is not required to specifically refer to every piece of evidence in the decision).  Here, the ALJ specifically indicated he had considered the "entire record" before him. Tr. at 20. Throughout his decision, he discussed evidence from medical and teaching professionals in determining whether

21

Plaintiff met or medically equaled Listing 112.05D or another Listed impairment.  Tr. at

20  26.  His decision to discount the I.Q. score of 70 was not error.

           b.      The ALJ's Finding is Supported By Substantial Evidence.

Plaintiff also argues that the ALJ's decision is not supported by substantial

evidence because of the following:  (a) the ALJ did not consider all relevant evidence in

that he disregarded the evidence from the Greenville County School District's report that

indicated Plaintiff was deficient in several areas of intellectual functioning; and (b) the

ALJ did not consider and address Dr. Batson's opinion that the I.Q. score of 70 was a

reliable estimate of his intellectual functioning.  Pl.'s Br. at 12  13.

The court has already analyzed these arguments in addressing Plaintiff's first

allegation of error and will not revisit them in detail here.  As discussed above, the court

finds that the ALJ considered and analyzed record evidence in determining that the

October 2006 I.Q. score of 70 was not valid.  Contrary to Plaintiff's argument, the ALJ

did not disregard the evidence from the Greenville County School District's testing, nor

did he disregard Dr. Batson's findings.  He was not required to quote every line of every

document or report in making his findings.  *See Jackson,* 2010 WL 500449, *10.  The

court finds that the ALJ's determination that Plaintiff did not have a valid I.Q. score to

satisfy the I.Q. score requirement of Listing 112.05D is supported by substantial

evidence.  Therefore, the court affirms the ALJ's decision.

    2.     Plaintiff Has Not Established That He Satisfies the Diagnostic Definition of Listing 112.05.

The Commissioner also claims that, even if the court were to determine the ALJ erred in finding Plaintiff's I.Q. score of 70 invalid, that error would be harmless. Def.'s Br. at 14, n.6. The Commissioner argues that satisfying the two requirements set out in subsection D itself   i.e., an I.Q. score of 60 through 70 and a "physical or other mental impairment imposing an additional and significant limitation of function"[4]   are not enough for Plaintiff to satisfy his burden of showing he meets Listing 112.05D.

The Commissioner argues that a claimant must satisfy the diagnostic description in the introductory paragraph of Listing 112.05, as well as show he meets one of the six sets of criteria set forth in paragraphs A through F of the Listing. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §112.00(A); *see also* 71 Fed. Reg. 10419, 10423 (2006) ("you must have mental retardation that satisfies the criteria in the introductory paragraph . . . in addition to

---

[4]The Commissioner does not focus on subsection D's second requirement of having a physical or additional mental impairment. This is unsurprising because the ALJ found that Plaintiff suffered from several other severe impairments, which satisfies the second portion of Listing 112.05D. *See, e.g., Cagle v. Astrue*, 9:09-3250-RMG, 2011 WL 322554, *3 (D.S.C. Jan. 28, 2011) (noting ALJ's finding that claimant had severe physical impairment satisfied this requirement in the analogous adult Listed impairment, Listing 12.05C).

the criteria in one of the paragraphs that follows"). Only then should the ALJ consider whether a claimant satisfies one of the subsections A through F.[5]

The Commissioner argues that, although Plaintiff focuses his appeal on the I.Q. scores themselves, the critical issue to be considered is whether Plaintiff meets the criteria of the diagnostic portion of the Listing. The Commissioner argues that Plaintiff must demonstrate the following to show he meets Listing 112.05D: (1) mental retardation,

---

[5]Listing 112.05 is the children's Listing for mental retardation. The similar adult Listing, Listing 12.05, provides in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

Subsection C of Listing 12.05 is analogous to subsection D of Listing 112.05C, and additionally requires:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05. Further, Section 12.00 of the adult Listings provides as follows:

> . . . Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Given the similarity of Listing 12.05C and 112.05D's requirements, the court considers cases interpreting Listing 12.05C persuasive in considering Listing 112.05D.

which refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning; (2) a valid verbal, performance or full scale I.Q. of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant limitation of function. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 112.00 and 112.05(D).

The Commissioner then argues that Plaintiff has not established any of these requirements of Listing 112.05, so that the ALJ need not have reached the issue of whether Plaintiff had a valid I.Q. score that satisfied the specific requirements of subsection D. Def.'s Br. at 13 18. Accordingly, the Commissioner argues, any improper finding as to the I.Q. score necessary to satisfy subsection D did not change the result.

Plaintiff does not focus on this legal issue of whether he should be required to establish that he satisfies the diagnostic definition section of Listing 112.05. However, in outlining what he was required to prove to show he satisfied Listing 112.05D, he quotes only the requirements of an I.Q. score of 60 through 70 and another physical or mental impairment. Pl.'s Br. at 9.

Although the Fourth Circuit has not directly considered whether the language in the preamble to Listing 112.00 are additional points claimants must establish to satisfy one of the Listings in 112.00, circuits that have considered the issue in connection with the parallel adult Listing, Listing 12.05C, seem uniformly to find that a claimant must establish both the diagnostic portion of the introductory paragraph in addition to one of

the severity indicators, delineated in subsections A  F.  *See, e.g., Randall v. Astrue*, 570

F.3d 651, 657  59 (5th Cir. 2009) (collecting cases).

Based on the seemingly uniform position of the circuits, and in the absence of

contrary guidance from the Fourth Circuit, the court agrees that a claimant must establish

that he satisfies the diagnostic definition in Listing 112.05 in addition to satisfying the

I.Q. score requirement and the presence of another impairment "imposing an additional

and significant limitation of function" to establish that he meets Listing 112.05D.

> 3.    The ALJ's Failure to Consider Whether Plaintiff Satisfied the
>        Diagnostic Definition Section of Listing 112.05 Was Harmless Error.

The Commissioner argues that Plaintiff cannot establish he satisfies the criteria in

the beginning of Listing 112.05 for two reasons: (a) Plaintiff has not been diagnosed with

"mental retardation;" and (b) Plaintiff has not demonstrated "deficits in adaptive

functioning." Def.'s Br. at 13  18.

> a.    A Diagnosis of "Mental Retardation" Not Necessary to
>       Establish Listing 112.05D.

The Commissioner contends that the ALJ's determination that Plaintiff did not

satisfy Listing 112.05D was appropriate because Plaintiff never received a diagnosis of

"mental retardation."  *See*, *e.g.,* Def.'s Br. at 1 (arguing a claimant must "have mental

retardation" to meet the Listing and none of Plaintiff's medical sources or records "have

found or suggested he was mentally retarded"); *see also* Def.'s Br. at 13  17 (citing to

definitions in the Diagnostic and Statistical Manual of Mental Disorders   Fourth Edition

["DSM IV"] as support for argument that diagnosis of "mental retardation" necessary to satisfy Listing 112.05's introductory diagnostic definition and claiming Plaintiff's diagnoses of "borderline intellectual function" could not satisfy that requirement). The Commissioner cites no legal authority for his argument. The court's independent research has not revealed any controlling Fourth Circuit authority on this issue; however, the Eighth Circuit has considered this argument and held that a claimant does not have to be formally diagnosed with mental retardation to meet the Listing's definition of mental retardation. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006); *see also Dorman v. Astrue*, No. PWG-09-1052, 2011 WL 1135785, *1 (D. Md. March 25, 2011) (*citing Maresh* and rejecting Commissioner's argument that diagnosis with mental retardation was requirement for establishing Listing 112.05D). The Eighth Circuit reasoned that nothing in the plain language of the Commissioner's regulations indicated such a requirement.

Further, the *Maresh* court rejected the Commissioner's assertion that definitions in the DSM IV established that Plaintiff had not satisfied the diagnostic criteria of the Listing. *Maresh*, 438 F.3d at 899. As the court explained, when revising the Listings in 2002, "the Commissioner rejected a proposal that the DSM's definition be used for Listing 12.05." *Maresh*, 438 F.3d at 899 (*citing* 67 Fed. Reg. 20,022). Recently, United States District Judge Henry Herlong of this District noted this rule-making history in rejecting the Commissioner's argument that a claimant did not satisfy the diagnostic

requirement of Listing 12.05 because the claimant arguably did not meet the DSM-IV's

definition of mental retardation.   Judge Herlong elaborated on the regulatory history as

follows:

> When the SSA revised its Listing of Impairments in 2002, it declined a proposal to incorporate the DSM's definition of mental retardation into Listing 12.05. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (Apr. 24, 2002). Instead, it surveyed definitions employed by leading professional organizations dealing with mental retardation, finding that "[w]hile all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* The SSA explained that Listing 12.05 provides the "necessary elements" to demonstrate mental retardation "while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.*

> Given the SSA's decision to reject the DSM's definition of mental retardation in 2002, it follows that the DSM is not controlling. The SSA's diagnostic definition of mental retardation requires [Plaintiff] to prove only subaverage intellectual functioning and the onset of deficits in adaptive functioning manifested prior to the age of 22.

*Smith v. Astrue*, C.A. No. 3:10-66, 2011 WL 846833, *3 (March 7, 2011).

The court agrees with these analyses and finds it is unnecessary for a claimant to

have been diagnosed with "mental retardation," or to have met the precise definition of

"mental retardation" as set out in the DSM or similar publication to establish the

diagnostic portion of Listing 112.05.   The claimant must also satisfy one of the

subcategories A, B, C, D, E, or F.

28

Here, that Plaintiff was not diagnosed with "mental retardation" does not foreclose him from satisfying Listing 112.05D.  Rather, he must establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning"  and a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."   Listing 112.05; Listing 112.05D.

> b.    The ALJ Did Not Consider Whether Plaintiff Had Subaverage General Intellectual Functioning With Deficits in Adaptive Functioning.

In addition to the argument about a diagnosis of mental retardation, the Commissioner argues that Plaintiff was required to establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning." Def.'s Br. at 16 (*quoting* Listing 112.05).  The court agrees that a claimant must establish this to satisfy the requirements of any of the Listed impairments found at Listing 112.05.

It is undisputed that the ALJ did not analyze this portion of Listing 112.05. Rather, he focused only on the I.Q. scores in the record, finding Plaintiff did not satisfy Listing 112.05D because he did not have a valid score between 60 and 70.  Tr. at 20.  The Commissioner argues, however, that the ALJ effectively analyzed that portion of the Listing and found that Plaintiff did not satisfy the requirements of the diagnostic portion of Listing 112.05.  He argues that the ALJ "accepted the premise" that Plaintiff had

29

"significantly subaverage general intellectual functioning," based on the ALJ's finding Plaintiff had the severe impairment of low intellectual functioning. Def.'s Br. at 16.

The Commissioner then claims that the ALJ "essentially found" that Plaintiff's subaverage intellectual functioning was not accompanied by deficits in adaptive behavior. Def.'s Br. at 16 (citing to Tr. at 20). The Commissioner argues that Dr. Batson's report the same report that includes the I.Q. score of 70 that the ALJ discounted supports the ALJ's decision that the Commissioner claims "essentially" found Plaintiff did not have adaptive functioning deficits because Dr. Batson diagnosed Plaintiff with borderline intellectual functioning. Tr. at 241. The Commissioner argues that, because Dr. Batson made that diagnosis, rather than finding Plaintiff had mental retardation, her report "reflected a judgment on her part that [Plaintiff] did not have deficits in adaptive functioning." Def.'s Br. at 16. To support that argument, the Commissioner cites page 48 of the DSM-IV for the proposition that borderline intellectual functioning "reflects a lesser degree of intellectual impairment than mental retardation." Def.'s Br. at 16. He continues the argument with citation to other reports of Plaintiff's "borderline intellectual functioning." Def.'s Br. at 17.

In his reply brief, Plaintiff argued that Dr. Batson's report in no way established that Plaintiff had no deficits in intellectual functioning. Pl.'s Reply Br. at 3. Rather, Plaintiff points to Dr. Batson's note in her report that Plaintiff's "adaptive behaviors were rated as falling significantly below the average range (less than 1st percentile)," and that

30

Plaintiff's mother and teacher rated his adaptive behaviors as "moderately to significantly reduced across domains assessed." Tr. at 241.

However, the ALJ did not expressly consider any of the requirements of the diagnostic portion of Listing 112.05. Neither party's argument about what the ALJ may have essentially found or what the record evidence revealed about Plaintiff's intellectual functioning or adaptive functioning is of any moment here.

The court could remand this matter to the ALJ with instructions to consider de novo the issue of whether Plaintiff meets or medically equals the requirements of Listing 112.05D, considering the diagnostic requirements of 112.05 prior to considering the specific I.Q. and other impairment requirements of subsection D. However, as discussed above, the court finds the ALJ's determination that Plaintiff does not satisfy the I.Q. score requirement of subsection D is supported by substantial evidence. Although the ALJ should have considered the diagnostic criteria, that error was harmless because, without a valid I.Q. score between 60 and 70, Plaintiff could not prevail in establishing that he met the requirements of Listing 112.05D.

Plaintiff has not challenged the remainder of the ALJ's analysis, including his detailed findings regarding the various domains of function he considered in determining Plaintiff did not "medically equal" the Listing requirements. Tr. at 22 26. Therefore, the court will not discuss that portion of the ALJ's decision.

III.    Conclusion

Because the ALJ's finding that Plaintiff does not meet the requirements of Listing 112.05D is supported by substantial evidence, Plaintiff's allegations of error are dismissed.  The Commissioner's determination that Plaintiff is not disabled is affirmed.

IT IS SO ORDERED.

May 5, 2011                                              Shiva V. Hodges
Florence, South Carolina                                United States Magistrate Judge